**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| SHERRY WINK<br><br>Plaintiff,<br><br>v.<br><br>NOVO NORDISK INC.;<br>NOVO NORDISK A/S<br><br>Defendants. | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: ____________ |

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Central District of Illinois as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors:

_X_ Plaintiff currently resides in McNabb, Illinois (City/State).

_X_ Plaintiff purchased and used Defendant(s)' products in McNabb, Illinois (City/State).

___ The Original Venue is a judicial district in which Defendant __________ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

_X_ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)):

______________________________________________________________________.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and

the Original Venue is a judicial district in which Defendant ______________ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): ____________________________________________ .

# **COMPLAINT AND JURY DEMAND**

COMES NOW, Plaintiff SHERRY WINK ("Plaintiff"), by and through the undersigned attorneys, and brings this action against NOVO NORDISK, INC. and NOVO NORDISK A/S (hereinafter "Defendants" or "Novo Nordisk") for personal injuries, including the development of non-arteritic anterior ischemic optic neuropathy ("NAION"), which Plaintiff suffers from as a proximate result her use of Defendant's drug, Ozempic. Plaintiff alleges the following:

## NATURE OF THE ACTION

1. This is an action for damages relating to Defendant's research, testing, development, manufacturing, labeling, marketing, promoting, selling, inspecting, and distribution of Ozempic, an injectable prescription medication approved by the U.S. Food and Drug Administration ("FDA") to improve blood sugar and reduce the risk of major cardiovascular events in individuals with type 2 diabetes.

2. Ozempic is a brand-name prescription medication containing semaglutide. Semaglutide is a glucagon-like peptide-1 receptor agonist (GLP-1 RA). The GLP-1 hormone is made by the small intestine, and, among other things, it triggers insulin to release from the pancreas, blocks glucagon secretion, and slows stomach emptying. GLP-1 RAs, including semaglutide, mimic the GLP-1 hormone by attaching to cell receptors and triggering the effects of the GLP-1 hormone.[1]

3. As a result of, among other things, Defendant's failure to warn physicians and end users of Ozempic of the complications and devastating effects of which the company knew or should have known, including NAION, Plaintiff was prescribed and took Ozempic as directed by her physicians, and dufe to Plaintiff's Ozempic use, she developed NAION in her

[1] https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists. (Last accessed Jan. 30, 2026).

right eye and suffers from severe physical and emotional injuries, as well as radical changes to her lifestyle due to her severe loss of sight.

4. NAION, also referred to as an "eye stroke," is caused by decreased blood flow to the optic nerve. It causes optic swelling and sudden, painless and permanent vision loss in one or both eyes. There is no proven effective treatment for NAION.[2]

5. Plaintiff brings this action for personal injuries as a proximate result of her prescription and use of Ozempic. Accordingly, Plaintiff seeks compensatory and punitive damages, and all other available remedies provided to her under the law because of injuries she sustained due to Defendant's wrongful conduct.

**PARTIES**

6. At all relevant times, Plaintiff Sherry Wink was a resident and citizen of the State of Illinois and the County of Putnam.

7. Plaintiff used Ozempic, Defendant's drug, which contains active ingredient GLP-1 RA semaglutide, and as a result, suffers from NAION.

8. Novo Nordisk Inc. is a Delaware corporation that has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

9. Novo Nordisk A/S is a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsvaerd, Demark.

10. Defendant, as holder of Ozempic's new drug application (NDA), is responsible for conducting Ozempic's clinical trials, post-market surveillance and pharmacovigilance, as well as reporting adverse events regarding Ozempic use to the FDA.

[2] https://www.nanosweb.org/i4a/pages/index.cfm?pageid=4196#:~:text=Most%20people%20with%20NAION%20do,a%20diagnosis%20of%20sleep%20apnea. (Last accessed Jan. 31, 2026).

11. Upon information and belief, Defendant failed to warn physicians and the end users of Ozempic, including Plaintiff's treating physicians and Plaintiff, of the complications and devastating effects of which Defendant's knew or should have known.

**JURISDICTION AND VENUE**

12. The Original Venue has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because there is complete diversity between Plaintiff and Defendant, and because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000) exclusive of interest and costs. Plaintiff was and is a resident of the State of Illinois. Each Defendant is neither incorporated nor has its principal place of business in the State of Illinois.

13. The Original Venue has personal jurisdiction over Defendant under one or more provisions of CPLR § 302(a)(1) because at all relevant times Defendant has engaged in substantial business activities in the State of Illinois. At all relevant times, Defendant has transacted, solicited, and conducted business within the State of Illinois. Plaintiff's claims arise out of Defendant's transaction of business and their tortious acts within the State of Illinois, from which they realized pecuniary benefit.

14. The Original Venue is proper under 28 U.S.C. § 1391 because Plaintiff is a citizen and resident of Putman County, Illinois.

15. Pursuant to MDL No. 3164 Case Management Order No. 4, any plaintiff whose action would be subject to transfer to the aforementioned MDL may file their case directly in the MDL in the United States District Court for the Eastern District of Pennsylvania ("Transfer Venue").

**BACKGROUND**

**I. An Accidental Blockbuster: Semaglutide (Ozempic and Wegovy) for Weight Loss**

16. In the early 1980's it was discovered that the GLP-1 hormone regulates blood sugar. It causes insulin-producing cells of the pancreas to act when blood sugar rises too high.[3]

17. In the early 1990's Novo Nordisk discovered that when they implanted rats with tumors of pancreas cells, which produced large amounts of glucagon and GLP-1, the rats nearly stopped eating.[4]

18. In a video released by the Novo Nordisk Foundation, Dr. Lotte Knudsen stated, "these rats, they starved themselves[,] so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[5]

19. Later testing in human subjects demonstrated that those who received an intravenous drip of Novo Nordisk's GLP-1 RA liraglutide ate 12% less at a lunch buffet as compared to those who received the placebo.[6]

20. From there, Novo Nordisk's research focused not only on the role of GLP-1 RAs in type 2 diabetes management but the role they could play in chronic weight management.

21. In 2008, Novo Nordisk submitted their new drug application (NDA) for liraglutide, brand name Victoza, to the FDA. In 2010, the FDA approved Novo Nordisk's NDA, providing for the use of the Victoza, a once daily injection, for adults with type 2 diabetes mellitus.[7,8]

---

[3] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html. (Last accessed Jan. 30, 2026).
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] https://pmc.ncbi.nlm.nih.gov/articles/PMC2957743/#%3A~%3Atext%3DThe%20incretin%20mimeti (Last accessed Jan. 30, 2026).
[8] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022341s000approv.pdf (Last accessed Jan. 31, 2026).

22. Novo Nordisk, following clinical trials, submitted another NDA for liraglutide. This time under the brand name Saxenda and requested its approval as a daily injectable for chronic weight management. In December of 2014, the FDA approved the NDA for Saxenda for weight loss.[9,10]

23. Saxenda, however, like Victoza, required daily injections and had only modest weight loss effects, with patients losing only about 5% of their weight.[11]

24. Thereafter, Novo Nordisk continued their GLP-1 RA research, trying to find ways to make a longer-lasting GLP-1 RA so that consumers would not need daily injections. The result was a GLP-1 RA compound known as semaglutide.[12]

25. On December 5, 2016, Defendant announced that they submitted a new drug application (NDA) to the FDA for semaglutide, brand name Ozempic, a once-weekly injectable, in 0.5 mg or 1 mg doses, for treatment of type 2 diabetes. In the announcement, Defendant represented that in clinical trials Ozempic had a safe and well-tolerated profile and that nausea was the most common adverse event.[13]

26. On December 5, 2017, the FDA approved the Ozempic application and granted premarket approval of the drug as NDA 209637.[14]

27. When Novo Nordisk announced that they had started selling Ozempic in the United States, they touted the medication as a "new treatment option[]" that "addresses the

---

[9] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-for-saxenda-liraglutide-rdna-origin-injection-for-chronic-weight-management-300013975.html (Last accessed Jan. 30, 2026).
[10] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (Last accessed Jan. 30, 2026).
[11] *Id.*
[12] *Id.*
[13] https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (Last accessed Jan. 30, 2026).
[14] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/209637s000ltr.pdf (Last accessed Jan. 30, 2026).

concerns and needs of people with diabetes[.]" Novo Nordisk offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription for up to two years."

28. On June 4, 2018, not even one year after the Ozempic NDA approval, Defendants began a clinical trial in patients who were overweight or obese. The study compared weight loss in participants taking semaglutide to weight loss in participants taking a placebo. The semaglutide dosing schedule was as follows: .25mg for weeks 1-4, .50mg for weeks 5 to 8, 1.0mg for weeks 9 to 12, 1.7mg for weeks 13 to 16, and 2.5mg for weeks 17 to 68.

29. The primary outcome of the study was to evaluate change in body weight and determine the number of participants who achieved 5 percent or more body weight reduction by week 68.[15]

30. On March 20, 2019, Defendant submitted a supplemental new drug application (sNDA) for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic to add the indication of reducing the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[16] On January 16, 2020, the FDA approved this new indication.[17]

31. The results of the aforementioned clinical trial, completed in March of 2021, argued that for participants who were overweight or obese, 2.4 mg of semaglutide, once

---

[15] https://clinicaltrials.gov/study/NCT03548935 (Last accessed Jan. 30, 2026)
[16] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (Last accessed Jan. 30, 2026).
[17] https://www.prnewswire.com/news-releases/fda-approves-ozempic-for-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-and-known-heart-disease-updates-rybelsus-label-300988672.html (Last accessed Jan. 30, 2026)

weekly, plus lifestyle intervention was associated with sustained, clinically relevant reduction in body weight.[18]

32. The study, which was funded by Defendant, also states, "Obesity is a global health challenge with few pharmacologic options," and "Obesity is a chronic disease and global public health challenge."[19]

33. On May 28, 2021, Defendant submitted another sNDA requesting approval for a higher, 2 mg dose of Ozempic injection. On March 28, 2022, the FDA approved this request.[20]

34. Novo Nordisk's June 4, 2021 press release announced that the FDA approved Novo Nordisk's NDA for semaglutide, this time brand name Wegovy, an injectable perception medication used one weekly for adults with obesity or overweight who also have weight-related medical problems to help them lose weight and keep off the weight.[21]

35. The press release touts that "the most common side effects of Wegovy may include[] nausea, diarrhea, vomiting, constipation, stomach (abdomen pain), headache, tiredness (fatigue), upset stomach, dizziness, feeling bloating, belching, gas, stomach flu and heartburn."[22]

36. On March 8, 2024, the FDA approved a new indication for Wegovy, to reduce the risk of cardiovascular death, heart attack and stroke in adults with cardiovascular disease who are either overweight or obese.[23]

---

[18] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last accessed Jan. 30, 2026)
[19] https://clinicaltrials.gov/study/NCT03548935 (Last accessed Jan. 30, 2026)
[20] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html#:~:text=PLAINSBORO%2C%20N.J.%2C%20March%2028%2C,at%20their%20blood%20sugar%20target. (Last accessed Jan. 30, 2026).
[21] https://www.novomedlink.com/content/dam/wegovy/pdf/Wegovy%20Press%20Release_6.4_FINAL.pdf (Last accessed Jan. 30, 2026).
[22] *Id.*
[23] https://www.fda.gov/news-events/press-announcements/fda-approves-first-treatment-reduce-risk-serious-heart-problems-specifically-adults-obesity-or (Last accessed Jan. 30, 2026).

37. No version of the Wegovy or Ozempic label warns patients or their treating physicians that taking semaglutide containing drugs may cause NAION or result in permanent vision loss.

**II. Defendant Creates a Market: Novo Nordisk's Rampant Marketing of their GLP-1 RAs Makes Their Products (Ozempic and Wegovy) into Mega Sellers**

38. Although Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for this specific indication, by July of 2018, Novo Nordisk had already begun to mention weight loss in its Ozempic commercials.

39. On July 30, 2018, Novo Nordisk launched its first Ozempic television advertisement to the tune of the 1970s hit pop song "Magic" by Pilot, which stated that "adults lost on average up to 12 pounds" when taking Ozempic.[24]




40. In 2018, Ozempic's launch year, Novo Nordisk spent $85.4 million marketing the drug and grossed $264 million globally. In 2019, Novo Nordisk spent $160.5 million on marketing the drug and grossed $1.65 billion globally. From 2018 to 2019, Novo Nordisk

[24] https://www.ispot.tv/ad/d6Xz/ozempic-oh (Last accessed Jan. 31, 2026).

added three additional television commercials with the "Magic" theme song and the drug quickly grew in popularity.[25]

41. In 2022, Novo Nordisk reported that it spent over $100 million on advertising Ozempic.[26] The drug ranked as the sixth most advertised prescription drug brand that year, with a U.S. measured media spend of $181 million, as reported by AdAge Leading National Advertisers 2023.[27]

42. Defendants also employed a sophisticated use of social media platforms, including TikTok and Instagram to expand marketing of their semaglutide, Ozempic and Wegovy, products.

43. As of November of 2022, the TikTok hashtag #Ozempic had over 273 million views.[28] By March of 2023, it had over 300 million views.[29]

44. As of September 9, 2023, the TikTok hashtag #ozempicjourney had over 199.5 million views.

45. Popular Wegovy TikTok hashtags include #Wegovy, #WegovyResults and #WegovyJourney.

46. On July 10, 2023, AdAge, a global media company, declared Ozempic as "2023's buzziest drug" and one of the "Hottest brands, disrupting U.S. culture and industry."[30]

---

[25] https://www.fiercepharma.com/special-report/top-10-advertisers-big-pharma-for-2019 (Last accessed Jan. 31, 2026).
[26] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (Last accessed Jan. 31, 2026).
[27] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571/ (Last accessed Jan. 31, 2026).
[28] https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (Last accessed Jan. 31, 2026).
[29] https://www.isms.org/newsroom-categories/patientresources/march-2-2023-how-ozempics-rise-to-tiktok-stardom-i (Last accessed Jan. 31, 2026).
[30] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571/ (Last accessed Jan. 31, 2026).

47. In 2023, over $491 million was spent advertising "diabesity" drugs, including Ozempic and Wegovy.[31]

48. As a result of Novo Nordisk's widespread advertising and social media campaigns, celebrities joined the craze.

49. USA Today wrote an article about Jimmy Kimmel joking about Ozempic at the Oscars. He opened the show saying, "When I look around this room I can't help but wonder, 'Is Ozempic right for me?'" The article goes on to refer to Wegovy as "a new drug that has been found to induce weight loss" and that it is "sweeping Hollywood and reigniting the idea that 'thin is in.'"[32]

50. Howard Stern commented on the Ozempic "Magic" commercials, noting that all he hears during the commercial is "Oh Oh Oh Ozempic" and that the viewer is distracted from the long list of side effects.[33]

51. Novo Nordisk has also spent millions of dollars delivering their message to physicians, healthcare providers and consumers.

52. For example, according to Open Payment Data, Novo Nordisk's traditional physician marketing spending was as follows: $33 million in 2022, $22 million in 2023, and $25 million in 2024.[34]

53. While spending millions on marketing their GLP-1 RA products, advertising Wegovy and Ozempic off label for weight loss, and creating a thin is in mindset, Novo Nordisk

---

[31] https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/ (Last accessed Jan. 31, 2026).
[32] https://www.usatoday.com/story/life/health-wellness/2023/03/13/ozempic-sweeping-hollywood-celebrities-weight-loss/11428801002/ (Last accessed Jan. 31, 2026).
[33] https://www.youtube.com/watch?v=QD-nCQn1Ads (Last accessed Jan. 31, 2026).
[34] https://openpaymentsdata.cms.gov/company/100000000144 (Last accessed Jan. 31, 2026).

failed to disclose the true risks of their semaglutide products, including but not limited to NAION and permanent vision loss.

### III. Marketing Works: Millions Spent on Advertising Results in Thousands of Prescriptions and Billions in Sales

54. As a result of Novo Nordisk's all-encompassing advertising and promotional efforts, both Wegovy and Ozempic are widely prescribed throughout the United States.

55. According to research performed by JAMA Health Forum, in which they reviewed data from IQVIA's National Prescription Audit PayerTrak, which captures 92% of prescriptions filled and dispensed to individuals at retail pharmacies in the United States, between January 2021 and December 2023, semaglutide prescriptions increased by 442%.[35]

56. JAMA Health Forum reported that Ozempic prescriptions peaked in August of 2023 with 1,968,892 prescriptions that month. Notable increases in Wegovy monthly prescriptions started in January of 2023 with 157,554 prescriptions and increased from there, peaking in May of 2023 with 519,510 prescriptions.[36]

57. In the discussion, JAMA Health Forum explains that the "number of semaglutide prescriptions filled at retail pharmacies increased substantially, reaching 2.6 million prescriptions filled at retail pharmacies by December of 2023." Research showed that "while Ozempic persistently accounted for most semaglutide [prescriptions], increases were considerably greater for Wegovy since its approval for weight loss in June 2021." Researchers considered that "these increases [] primarily occurred following increased awareness of weight-loss benefits in late 2022[.]"[37]

---

[35] https://jamanetwork.com/journals/jama-health-forum/fullarticle/2821688?resultClick=24 (Last accessed Jan. 31, 2026).
[36] *Id.*
[37] *Id.*

58. In 2023, global Wegovy sales were over $3 billion. In 2024, global Wegovy sales were around $8 billion.[38]

59. A FiercePharma article opines that over the past three years, Novo Nordisk has nearly tripled its global GLP-1 patient reach and that as of February of 2025, Novo Nordisk holds about two-thirds of the total GLP-1 market for patients with diabetes and obesity.[39]

60. Novo Nordisk has spent millions of dollars advertising their semaglutide containing products, Ozempic and Wegovy, which has resulted in increased prescription fills year over year, and billions in sales for Novo Nordisk, without warning consumer patients and their treating physicians about the risk of NAION.

## IV. Non-Arteritic Anterior Ischemic Optic Neuropathy and it's Sequalae

61. Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition, often referred to as an "eye stroke" which causes irreversible damage to the optic nerve and results in permanent vision loss and blindness.

62. The general opinion amongst the medical community is that NAION is caused by insufficient blood supply or ischemia to the optic nerve.

63. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have pain such as a headache or periocular pain.

64. NAION and its accompanying vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

[38] https://www.fiercepharma.com/pharma/novo-nordisk-predicts-milder-sales-growth-2025-after-obesity-star-wegovy-doubles-numbers-q4 (Last accessed Jan. 31, 2026).
[39] *Id.*

65. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[40]

66. About 15% of patients who have NAION in one eye will eventually develop it in their other eye.[41]

67. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many patients with NAION cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Blindless in one or both eyes results in bumps and falls and injuries related to unseen impacts and accidents.

## V. Holder of the NDA: Novo Nordisk Has Long Known that the GLP-1 RA Semaglutide is a Powerful and Dangerous Drug

68. Defendants, through their pre-market and post-market research, knew or should have known of the causal association between the use of its semaglutide containing products, Ozempic Wegovy and the risk of developing NAION and its sequelae, but they ignored it.

69. It has been known since at least 2016 that the human eye contains GLP-1 receptors.[42]

70. The FDA's Adverse Events Monitoring System (AEMS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs. The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[43]

---

[40] *Ischemic Optic Neuropathy,* Cleveland Clinic, (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseaes/ischemic-optic-neuropathy (Last accessed Jan. 31, 2026).
[41] *Id.*
[42] 47 Hernández C et al, Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes, DIABETES 2016 Jan;65(1):172-87. doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.
[43] The AEMS database is accessible online at https://www.fda.gov/drugs/fda-adverse-event-monitoring-system-aems/fda-adverse-event-monitoring-system-aems-public-dashboard.

71. Defendant conducts clinical trials and has access to case reports and medical literature that provides it with superior knowledge compared to the general public as to potential risks of its medications.

72. For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event. The event occurred within the Semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION.[44]

73. Additionally, clinical observations by neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

74. The study "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide," authored by Hathaway et al., involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients, including 16,827 patients over the age of 12, 710 of whom had type 2 diabetes, and 979 of whom were overweight or obese.[45]

75. Of the 710 patients with type 2 diabetes, 194 were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications. Of the 979 overweight or

---

[44] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232. Updated February 13, 2023. Accessed February 18, 2025.

[45] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296

obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[46]

76. Within the type 2 diabetes study population, NAION occurred in 17 patients in the semaglutide cohort as compared to 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the non-semaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort as compared to the non-semaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; P < .001; concordance coefficient = 0.84).[47]

77. Within the overweight or obese cohort, NAION occurred in 20 patients in the semaglutide cohort as compared to 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort as compared to 0.8% (95% CI, 0%-1.8%) in the non-semaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort as compared to the non-semaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86.[48]

78. The primary outcome of the Hathaway et al. study is that use of Ozempic (semaglutide) is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals

---

[46] *Id.*
[47] *Id.*
[48] *Id.*

prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[49]

79. Silverii, et al, performed a meta-analysis of all clinical trials of GLP-1 receptor drugs, including Defendant's own clinical trials, and found a non-statistically increased risk of optic ischemic neuropathy. Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk. However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[50]

80. On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish- Norwegian cohort study," found an association between use of semaglutide for type 2 diabetes.[51]

81. This cohort study compared the risk of NAION among individuals with type 2 diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication. The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[52]

---

[49] *Id.*
[50] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomized controlled trials. Diabetes Obes. Metab. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076
[51] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online December 11, 2024. doi:10.1101/2024.12.09.24318574.
[52] *Id.*

82. In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023, 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[53]

83. "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed." The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[54]

84. Interestingly, the study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[55]

85. Due to the findings of the two Denmark studies, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION. PRAC explained that they will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[56]

86. In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[57]

87. A recent case series published by Katz et al., "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine

---

[53] Grauslund J, Taha AA, Molander LD, et al. Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. Intl. Journal of Retina and Vitreous. 2024;10(1):97. doi:10.1186/s40942-024-00620-x
[54] *Id.*
[55] *Id.*
[56] https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/ (Last accessed Jan. 31, 2026).
[57] https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link- between-ozempic-and-blindness (Last accessed Jan. 31, 2026).

patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[58]

88. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[59] The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

89. A study published on April 7, 2025, analyzing FDA Adverse Event reports, indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[60]

90. On June 6, 2025, PRAC, following their review of non-clinical studies, clinical trials, post-marketing surveillance and medical literature regarding semaglutide, recommend that the semaglutide Product Information be updated to include NAION as a side effect of semaglutide. The announcement explained that this information should be sent to the Committee for Medicinal Products for Human Use, which is responsible for questions concerning medicines for human use, which will adopt PRAC's opinion.[61]

---

[58] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. JAMA Ophthalmol. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058

[59] *Id.*

[60] Massy, et al. Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC Medicine (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.

[61] https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy (Last accessed Feb. 2, 2026).

91. Despite the growing number of articles, reports, and PRAC decision regarding the addition of NAION to the semaglutide product information, Defendant still provides no warnings about the dangerous side effect of NAION in conjunction with use of Ozempic or Wegovy in the United States.

**VI. Defendant's Continuing Failure to Disclose the Risk of NAION and Its Sequalae**

92. According to the Drugs@FDA website, the label for Ozempic has been updated on at least thirteen (13) occasions since 2017, with the most recent update on January 28, 2025.[62] Despite the fact there are at least fourteen (14) iterations of the Ozempic label, Defendant's labels have not contained any warning or any information whatsoever on the increased propensity of Ozempic to cause NAION and permanent vision loss as suffered by Plaintiff.

93. According to the Drugs@FDA website, the label for Wegovy has been updated on at least nine (9) occasions since 2021, with the most recent update on November 27, 2024.[63] Despite the fact that there are at least ten (10) iterations of the Wegovy label, Defendant's labels have not contained any warning or any information whatsoever on the increased propensity of Wegovy to cause NAION and permanent vision loss as suffered by Plaintiff.

94. On June 6, 2025 the European Medicines Agency (EMA) recommended that the product information for semaglutide medicines including Ozempic, Wegovy, Rybelsus include NAION as a side effect.[64]

---

[62] *See* Drugs@FDA: FDA-Approved Drugs, Ozempic, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=209637 (Last accessed Jan. 31, 2026).
[63] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=215256 (Last accessed Jan. 31, 2026)
[64] https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy (Last accessed Jan. 31, 2026).

95. Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Ozempic, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

96. Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the labels.

97. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Ozempic or Wegovy's label without any prior FDA approval.

98. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

99. On November 9, 2026, the FDA informed patients and health care providers of a potential increased risk of NAION associated with the use of GLP-1 RA medications, including Ozempic. The announcement provides that, "The [FDA] is requiring application holders for all GLP-1 RA medications to add information to the Warnings and Precautions section of labeling about the potential risk of NAION associate with use of these medications."[65]

[65] FDA Requires Safety Labeling Changes for Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAs) Due to Potential Increased Risk of Rare But Serious Eye Condition, FDA Drug Safety Communication,

100. The decision came following the FDA's detailed review of reports in patients treated with GLP-1 RAs in the FDA Adverse Event Monitoring System, the FDA's meta-analysis of clinical trials across GLP-1 RA development programs and the FDA's retrospective cohort study in the FDA's Sentinel Real-World Evidence Data Enterprise Commercial Network, and the FDA's review of published observational studies.

101. Specifically, the FDA announced that their review found, among other things, the following: that "results showed a NAION incidence rate of 6.4 events per 100,000 [patient years] in patients treated with GLP-1 RAs compared to 3.8 events per 100,000 patient years in comparator-treated patients," and that "an increased risk of NAION was observed with GLP-1 RAs compared to DPP-4 inhibitors (HR: 1.43, 95% CI: 1.02, 2.01)."

102. To date, Defendant's semaglutide containing products, including Ozempic, labels are still devoid of any mention of NAION.

## PARTY PLAINTIFF

103. Plaintiff Sherry Wink is a residence of the State of Illinois and is currently 67 years old.

104. In January of 2024, Plaintiff was prescribed and started taking Ozempic to aid in diabetes management, which she used as prescribed until November of 2024.

105. In November of 2024, she suffered sudden vision loss in the bottom of her right eye visual field.

106. On December 10, 2024, Plaintiff underwent diagnostic testing and was diagnosed with NAION.

---

https://www.fda.gov/drugs/drug-safety-communications/fda-requires-safety-labeling-changes-glucagon-peptide-1-receptor-agonists-glp-1-ras-due-potential (Last visited November 24, 2026).

107. Thereafter, Plaintiff had blood testing performed, which ruled out giant cell arteritis.

108. On April 28, 2025, Plaintiff was evaluated by a retina specialist at Illinois Retina & Eye Associates, where her NAION diagnosis was confirmed and it was determined that her vision loss was so severe that she from one foot away, she could only count fingers.

109. Plaintiff's vision loss is permanent, and her life is forever changed due to her Ozempic use.

110. Defendant knew or should have known that use of semaglutide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

111. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and her physicians the true and significant risks associated with this medication.

112. At all times material to the above, the Ozempic label failed to adequately warn Plaintiff and her medical providers of the true risks of taking Ozempic.

113. At all times material to the above, marketing and advertising failed to adequately warn Plaintiff and her medical providers of the true risks of taking Ozempic.

114. Defendant continues to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

115. Defendant's Ozempic was at all times utilized and prescribed in a manner foreseeable to Defendant.

116. Plaintiff used Ozempic and did not misuse or alter the Ozempic in an unforeseeable manner.

117. As a result of Defendant's actions, Plaintiff and her physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendant's conduct.

118. As a direct result of being prescribed and using Ozempic, Plaintiff has been permanently and severely injured, having suffered serious consequences.

119. As a direct and proximate result of her Ozempic use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

120. Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Ozempic was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

121. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Ozempic, Plaintiff's physicians would not have prescribed, and Plaintiff would not have used, Ozempic and they would have chosen a different option for the treatment of her type 2 diabetes.

**COUNT I: STRICT LIABILITY – FAILURE TO WARN**

122. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

123. Ozempic is a product within the meaning of Illinois product liability.

124. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

125. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things, conducting pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping appraised of drug research.

126. Defendant, as a manufacturer, distributer, and marketer of pharmaceutical drugs, including Ozempic, is held to the level of knowledge of an expert in the field, and accordingly, knew or should have known the warnings and other clinically relevant information and data they distributed regarding the risks associated with the use of Ozempic were inadequate.

127. Plaintiff does not and did not have the same knowledge as Defendant and Defendant did not provide Plaintiff and Plaintiff's prescribing and treating physicians with adequate warnings, other clinically relevant information or data.

128. Defendant had a duty to provide adequate warnings and instructions for Ozempic, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their product.

129. Defendant had a continuing duty to provide consumers, including Plaintiff and Plaintiff's prescribing and threating physicians, with warnings and other clinically relevant

information and data regarding the risks and dangers associated with Ozempic as it became or could have become available to Defendant.

130. Defendant marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Ozempic, to health care providers empowered to prescribe and dispense Ozempic to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data.

131. Through both omission and affirmative misstatements, Defendant misled and continues to mislead the medical community about the risk and benefit balance of Ozempic, which resulted in permanent injuries to Plaintiff.

132. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

133. Despite the fact that Defendant knew or should have known that Ozempic caused and causes unreasonable and dangerous side effects, it continues to promote and market Ozempic without providing adequate clinically relevant information.

134. Defendant knew or should have known that consumers, including Plaintiff, would foreseeably and needlessly suffer injury as a result of Defendant's failures.

135. The Ozempic supplied to Plaintiff by Defendant was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendant possessed knowledge and information confirming the defective and unreasonably dangerous nature of Ozempic but, despite this knowledge and information, Defendant failed and

neglected to issue adequate warnings that Ozempic causes serious and potentially irreversible vision issues, optic nerve damage, and NAION.

136. Defendant has yet to issue any warnings or recommendations that patients taking Ozempic should undergo ophthalmological monitoring prior to starting the drug and while taking the drug.

137. Defendant's failure to provide adequate warnings or instructions rendered Ozempic unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendant, and in that the risk of danger outweighs the benefits.

138. Defendant continues to fail to provide adequate warnings to the medical communing, including physicians and pharmacies, as well as consumers, including Plaintiff.

139. Defendant failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Ozempic including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

140. Defendant failed to provide adequate post-marketing warnings and instructions after Defendant knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

141. Defendant continued to aggressively promote and sell Ozempic, even after Defendant knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drug.

142. Defendant had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health

risks associated with exposure to Ozempic, and/or that safer and or an equally effective alternative drug product exists that does not pose this same risk.

143. By failing to adequately test and research harms associated with Ozempic, and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Ozempic and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Ozempic. The medical community, patients, patients' families, or regulators were not appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Ozempic and should or could be reported as an adverse event.

144. The semaglutide products, including Ozempic, designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant were defective due to inadequate post-marketing surveillance and/or warnings because even after Defendant knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Ozempic, Defendant failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote the drug.

145. Ozempic is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendant had exercised all possible care in their preparation and sale.

146. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Ozempic could have been reduced or avoided by Plaintiff,

prescribers, and/or other consumers if Defendant had provided reasonable instructions or warnings of these foreseeable risks of harm.

147. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT II: STRICT LIABILITY – DESIGN DEFECT**

148. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

149. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic. These actions were under the ultimate control and supervision of Defendant.

150. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things,

conducting pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping apprised of drug research.

151. Defendant, as a manufacturer, designer, distributer, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff. Despite this duty, Defendant placed this drug into the stream of commerce in a defective and unreasonably dangerous condition.

152. Ozempic is designed in such a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries and were kept on the market despite this defective condition.

153. Defendant knew or should have known that Ozempic, which Defendant developed, manufactured, labeled, marketed, sold, and/or promoted was defectively designed in that it posed a serious risk of severe and permanent vision and optic nerve injuries.

154. Defendant had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor its product.

155. Defendant sold, marketed and distributed its semaglutide products, which are unreasonably dangerous for their normal, intended, and foreseeable use.

156. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Ozempic, a defective product which created an unreasonable risk to the health of consumers, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff.

157. The Ozempic supplied to Plaintiff by Defendant was defective in design or formulation in that when it left the hands of the manufacturer or supplier it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an

ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendant in that is posed and poses a risk of serious and potentially irreversible vision issues and optic nerve damage to patients.

158. The Ozempic taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

159. The Ozempic taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

160. Ozempic is a medication indicated to aid in management of blood sugar in patients with type 2 diabetes. However, Ozempic causes serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes.

161. Plaintiff, ordinary consumers, and prescribers would not expect a drug designed and labeled for weight loss and cardiovascular health benefits and marketed as such to cause irreversible vision issues and optic nerve damage.

162. The Ozempic supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

163. The Ozempic supplied to Plaintiff by Defendant was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of

the drug and the risk involved in its use, the design of Ozempic makes the product unreasonably dangerous.

164. Ozempic's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

165. The intended or actual utility of Ozempic is not of such benefit to justify the risk of optic nerve damage that may be irreversible and permanently disabling thereby rendering the product unreasonably dangerous.

166. Ozempic's design defects render it more dangerous than other drugs and therapies designed for weight loss in that Ozempic causes an unreasonable increased risk of injury, including, but not limited, to potentially irreversible vision issues and optic nerve damage.

167. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

168. Ozempic is defective and unreasonably dangerous to Plaintiff and other consumers in that despite knowledge that Ozempic use could result in vision issues, Defendant failed to adequately test or study the drug, including but not limited to: pharmacokinetics and pharmacodynamics of the drug, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

169. Defendant acted unreasonably in its design of Ozempic in that Defendant failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable

alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

170. Defendant knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Ozempic's defective design.

171. Ozempic is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendant had exercised all possible care in the preparation and sale of these products.

172. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT III: NEGLIGENT FAILURE TO WARN

173. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

174. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

175. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things, conducting pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping appraised of drug research.

176. Ozempic was expected to reach, and did reach, users and consumers, including Plaintiff, without substantial change and was in a defective and unreasonably dangerous condition when it was sold or distributed.

177. Defendant owed Plaintiff and other Ozempic users a duty to exercise reasonable care when marketing, advertising, promoting, distributing and/or selling Ozempic.

178. At material times, Plaintiff used Ozempic in a manner intended and/or foreseeable to Defendant.

179. A reasonable patient or consumer of Ozempic would expect the drug to be free of significant defects.

180. Defendant knew or had reason to know of facts establishing that Ozempic could cause NAION and failed to warn of the risk.

181. At all times relevant hereto, the defective nature of Ozempic was known to Defendant, or reasonably and scientifically knowable to them through appropriate research and testing by known methods, including at the time they distributed, supplied, or sold Ozempic,

but not known to ordinary physicians and who would be expected to prescribe the drug to their patients.

182. In disregard of their duty to timely warn consumers of health risks associated with Ozempic, Defendant committed one or more of the following negligent acts or omissions:

a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Ozempic was designed and/or manufactured in a way that could cause injuries and damages, including NAION and permanent vision loss;

b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION and permanent vision loss;

c. Failing to timely warn Plaintiff and Plaintiff's physicians that a base line eye exam should be performed and ongoing monitoring was necessary.

183. At all relevant times, Ozempic's label was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of Ozempic, including NAION and permanent vision loss.

184. At all relevant times, Ozempic's label was inadequate because it did not warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including NAION and permanent vision loss.

185. At all relevant times, Ozempic's label was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

186. Defendant's failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

187. Defendant's failure to warn of the significant risks of Ozempic use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Ozempic.

188. Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Ozempic, Plaintiff would not have elected to begin and/or continue using Ozempic.

189. Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physician had they been warned of these significant risks outlined herein.

190. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. These losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT IV: NEGLIGENCE

191. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

192. At all relevant times, Defendant engaged in the business of researching, testing developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

193. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things, conducting pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping appraised of drug research.

194. At all relevant times, Defendant had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Ozempic products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning, including when used alone or in foreseeable combination with other drugs.

195. Defendant failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Ozempic in that Defendant knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

196. Defendant had no reason to believe that intended and foreseeable users of Ozempic, such as Plaintiff, would realize the potential harm from use of these products.

197. Defendant failed to exercise reasonable care to inform users, such as Plaintiff and Plaintiff's physicians, of Ozempic's risk of serious and potentially irreversible vision issues, harm to the optic nerve and NAION.

198. Defendant breached its duty of care to the Plaintiff and Plaintiff's physicians in its testing, monitoring, and pharmacovigilance of Ozempic.

199. In disregard of its duty, Defendant committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Ozempic without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, and designing, and distributing Ozempic while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with its use;

c. Failing to undertake sufficient research and testing to determine whether or not Ozempic was safe for its intended use;

d. Failing to disclose and warn the medical community, and consumers of Ozempic's product defect that Defendant knew and/or had reason to know, including that Ozempic was unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

e. Failing to warn Plaintiff, the medical community, and consumers that Ozempic's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those to whom it was reasonably foreseeable would use or prescribe Ozempic;

g. Advertising, marketing, and recommending the use of Ozempic, while concealing and failing to disclose or warn of the dangers known by Defendant to be connected with, and inherent in, the use of the product;

h. Representing that Ozempic was safe for its intended use when in fact Defendant knew and should have known the product was not safe for its intended purpose;

i. Continuing to manufacture and sell Ozempic with the knowledge that Ozempic is unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Ozempic so as to avoid the risk of serious harm associated with its use;

k. Failing to design and manufacture Ozempic so as to ensure this drug is at least as safe and effective as other similar products;

l. Failing to design and manufacture Ozempic in a way that it is reasonably safe for its intended purpose, which is in violation of objective safety standards;

m. Failing to ensure that Ozempic was accompanied by proper and accurate warnings, including, among other things, requiring baseline visual examinations and regular eye examinations while using the drug;

n. Failing to ensure that Ozempic was accompanied by proper and accurate warnings about possible adverse side effects associated with its use and that use of Ozempic created a high risk of severe, permanent injuries to vision; and

o. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Ozempic.

200. A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

201. As a direct and proximate result of Defendant's negligent testing, monitoring, and pharmacovigilance of Ozempic, Defendant introduced a product it knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent vision loss. Due to Defendant's negligence, Plaintiff has been catastrophically injured and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

202. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT V: NEGLIGENT MISREPRESENTATION AND MARKETING**

203. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

204. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

205. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things, conducting pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping appraised of drug research.

206. At all relevant times, Defendant negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Ozempic, including, but not limited to, misrepresentations regarding the safety and known risks of Ozempic.

207. The information distributed by the Defendant to the public, the medical community, Plaintiff and Plaintiff's healthcare providers, including advertising campaigns,

labeling materials, print advertisements, and commercial media, was false and misleading, contained omissions and concealed the truth regarding the dangers of Ozempic.

208. Defendant's conduct had the capacity to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers, and to falsely assure them of the quality of Ozempic and induce them to request, to recommend, to purchase, and to prescribe Ozempic.

209. Defendant's intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers, and to falsely assure them of the quality of Ozempic and induce them to recommend, to purchase, and to prescribe Ozempic.

210. Defendant had a duty to accurately and truthfully represent and market Ozempic to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Ozempic, including the drug's propensity to cause permanent vision loss, NAION and injury to the optic nerve.

211. Defendant made continued omissions in Ozempic's labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

212. Defendant made additional misrepresentations beyond the product labeling by representing Ozempic as a safe and effective treatment for type 2 diabetes with only minimal risks.

213. Defendant misrepresented and overstated the benefits of Ozempic to Plaintiff, Plaintiff's physicians, and the medical community without properly advising them of the known risks of permanent vision loss, NAION and injury to the optic nerve.

214. In reliance upon the false and negligent misrepresentations and omissions made by Defendant, Plaintiff healthcare provider was induced to prescribe, and Plaintiff was induced to use, Ozempic, thereby causing Plaintiff to endure severe and permanent injuries, including NAION and permanent vision loss.

215. In reliance upon the false and negligent misrepresentations and omissions made by the Defendant, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Ozempic use before it was too late. Defendant knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendant.

216. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Ozempic had the true facts not been concealed by the Defendant.

217. Defendant had sole access to many of the material facts concerning the defective nature of Ozempic and its propensity to cause serious and dangerous side effects.

218. At the time Plaintiff was prescribed and administered Ozempic, Plaintiff and Plaintiff's healthcare providers were unaware of Defendant's negligent misrepresentations and omissions.

219. Defendant failed to exercise ordinary care in making representations concerning Ozempic while Defendant was involved in its manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce because Defendant negligently misrepresented Ozempic's risk of unreasonable and dangerous adverse side effects.

220. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendant. These the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of Ozempic.

221. Plaintiff and Plaintiff's healthcare providers reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

222. As a direct and proximate result of reliance upon Defendant's negligent misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. These losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT VI: BREACH OF EXPRESS WARRANTY**

223. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

224. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed the drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

225. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things, conducting pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping appraised of drug research.

226. Defendant expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendant and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Ozempic was safe, effective, fit and proper for its intended use.

227. Ozempic materially failed to conform to those representations made by Defendant, in package inserts and otherwise, concerning the properties and effects of Ozempic, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendant constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Ozempic sold to Plaintiff.

228. Defendant expressly warranted that Ozempic was safe and well-tolerated. However, Defendant did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Ozempic was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

229. Ozempic does not conform to those express representations because Ozempic is defective, not safe, and has serious side effects.

230. Plaintiff and Plaintiff's physicians justifiably relied on Defendant's representations regarding the safety of Ozempic, and Defendant's representations became part of the basis of the bargain.

231. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendant's representations that Ozempic was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

232. Plaintiff's healthcare providers justifiably relied on Defendant's representations through Defendant's marketing and sales representatives in deciding to prescribe Ozempic over other alternative treatments on the market, and Plaintiff justifiably relied on Defendant's representations in deciding to purchase and use the drug.

233. Plaintiff purchased and used Ozempic without knowing that drug is and was not safe and well-tolerated and without knowing that drug causes significant and irreparable vision loss and eye damage.

234. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VII: BREACH OF IMPLIED WARRANTY

235. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

236. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

237. Defendant, as the holder of the NDA, is responsible for adhering to obligations of the FDA and associated regulatory authorities, which includes, among other things, conducting pre-market testing, post-market surveillance, pharmacovigilance, as well as reporting adverse events, effectuating label changes and keeping appraised of drug research.

238. Defendant was the seller of Ozempic and sold Ozempic to be taken to aid in management of chronic obesity.

239. When Ozempic was prescribed by Plaintiff's physician and taken by Plaintiff, the product was prescribed and used for the ordinary purpose for which it was intended.

240. Defendant impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

241. Defendant breached their implied warranties of the Ozempic product because the Ozempic they sold to Plaintiff was not fit for its ordinary purpose to help with weight loss.

242. Ozempic would not pass without objection in the trade; it is not of fair average quality; it is not fit for the ordinary purposes for which the product is used; was not adequately

contained, packaged and labeled; and fails to conform to the promises or affirmations of fact made on the container or label.

243. Defendant's breach of their implied warranties resulted in use of the unreasonably dangerous and defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VIII: CONSUMER FRAUD – VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECPETIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *et seq.*

244. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

245. Defendant's actions resulted in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA).

246. The ICFA prohibits "unfair methods of competition and unfair or deceptive acts or practices [] in the conduct of any trade or commerce[.]" 815 ILCS 505/1 §2.

247. The ICFA defines "person" to include "natural person." 815 ILCS 505/1 §1(c).

248. The ICFA defines "trade" or "commerce" to include, among other things, the advertising or sale of a commodity directly or indirectly effecting the people of Illinois. 815 ILCS 505/1 §1(f).

249. Had Defendant not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Ozempic and would not have incurred damages.

250. Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiff that would not have been paid had Defendant not engaged in unfair and deceptive conduct.

251. Despite knowing the falsity and misleading nature of their claims, Defendant engaged in unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts relative to the safety and efficacy of Ozempic.

252. Defendant intended such actions to mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Ozempic.

253. Such actions did, in fact, mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Ozempic.

254. Defendant had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Ozempic.

255. Defendant's deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff constituted unfair and deceptive acts and trade practices in violation of the ICFA.

256. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, and severally, as follows:

a. Judgment in favor of Plaintiff and against all Defendants, for damages in such amounts as may be proven at trial;

b. Compensation for both economic and non-economic losses, including but not limited to medical expenses, loss of earnings, loss of consortium, disfigurement, pain and suffering, mental anguish, and emotional distress, in such amounts as may be proven at trial;

c. Punitive and/or exemplary damages in such amounts as may be proven at trial;

d. Attorneys' fees and costs;

e. Interest; and

f. Any and all further relief, both legal and equitable, that the Court may deem just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated: November 24245, 2026

SULLIVAN PAPAIN BLOCK MCMANUS COFFINAS & CANNAVO P.C.

/s/ *Craig M. Silverman*
Craig M. Silverman
120 Broadway – 27th Floor
New York, New York 10271
Phone: (212) 732-9000
Fax: (212) 266-4141
Csilverman@triallaw1.com

*Attorneys for Plaintiffs*